**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**ALFONSO LOWE, III,**

**Plaintiff,**

**v.** **Case No. 25-CV-414-SCD**

**SALVATION ARMY,**

**Defendant.**

---

## DECISION AND ORDER

---

This case is about Alfonso Lowe's brief and ill-fated employment as a warehouse worker at the Salvation Army's rehabilitation center in Milwaukee, Wisconsin. During his short tenure, Lowe chalked up some nineteen tardy appearances, and the company fired him. Thereafter, Lowe sued his former employer in federal court, alleging race discrimination, hostile work environment, and retaliation. The company has moved for summary judgment on all three claims. Because Lowe has not presented sufficient evidence from which a reasonable jury could find that the company terminated him because of his race, subjected him to a racially hostile work environment, or retaliated against him for complaining about racial discrimination, I will grant the company's motion.

## BACKGROUND

The Salvation Army is a nonprofit, Christian organization. *See* Def.'s Facts ¶ 1, ECF No. 37. As part of its mission, the company provides extensive humanitarian services, including the adult rehabilitation center—a long-term residential program that assists adults who struggle to cope with drug and alcohol addictions. *Id.* ¶¶ 3–4. The rehabilitation center

provides housing, therapy, life skills education, bible study, and social activities for its participants (referred to as beneficiaries). *Id.* ¶ 5. Beneficiaries also work at rehabilitation center facilities, with the goal of restoring their physical, mental, and spiritual health to fully rejoin society. *Id.* ¶¶ 5–6. The rehabilitation center is funded by the sale of donated clothing and household goods in the Salvation Army's thrift stores. *Id.* ¶ 7.

In 2022, the Salvation Army hired two new warehouse workers at its Milwaukee rehabilitation center: Alfonso Lowe, III, and Michael John. *See* Def.'s Facts ¶¶ 11–18; Pl.'s Facts ¶ 1, ECF No. 46 at 18–20; Doyle Mot. in Limine Decl. Ex. P, at 1, 7, ECF No. 31-16. Lowe, a black man with dreadlocks, requested to work Monday through Friday from 7:30 a.m. until 4:30 p.m. John, who is white and a graduate of the Salvation Army's rehabilitation program, asked to work two days a week from 9:30 a.m. until 2:30 p.m. as an accommodation for his disability. Def.'s Facts ¶¶ 17–18, 21; Pl.'s Facts ¶ 1. The Salvation Army says it was able to accommodate John's requested work schedule because Lowe was hired as a full-time warehouse employee starting at 7:30, meaning there was coverage for the line-of-sight supervision of beneficiaries who arrived at that time. Def.'s Facts ¶ 19.

As a warehouse worker, Lowe priced merchandise and supported beneficiaries through training and mentoring. Def.'s Facts ¶ 25. He generally worked with fifteen to twenty beneficiaries at a time, and on some days, he was the only Salvation Army employee working in the same room as beneficiaries at the start of their shift. *Id.* ¶¶ 33–35. Beneficiaries arrived at 7:30 a.m. and needed line-of-sight supervision. *Id.* ¶¶ 28, 35. The Salvation Army says it hired Lowe because his requested schedule aligned with the company's need for supervising beneficiaries when their shift began. *Id.* ¶ 36.

Lowe's first day on the job was March 2, 2022. Def.'s Facts ¶ 13. The Salvation Army, which is organized based on a military model, first introduced Lowe to its leadership team. *See id.* ¶ 2; *see also* 3d Am. Compl., at 3–4, ECF No. 19. Steve Staneart, who is white, held the title of captain and supervised the entire rehabilitation center. *See* Def.'s Facts ¶¶ 1–2, 8. Daniel Arfsten (also white) indirectly supervised Lowe as the warehouse manager. *Id.* ¶¶ 29, 31. Other supervisors included Kim Kozak (white), Jason Grandstaff (race unknown), and Sarah Martin (white). *See id.* ¶ 32; *see also* 3d Am. Compl., at 4; Doyle MIL Decl. Ex. H, at 3, ECF No. 31-8. The company's HR representative was Lowe's sister, Destiny Kirksey. Def.'s Facts ¶¶ 9–10. When meeting for the first time, Arfsten told Lowe he looked like his favorite rapper from back in the day. *See* 3d Am. Compl., at 3–4; *see also* Def.'s Facts ¶ 41. Arfsten supposedly made similar comments to Lowe a few times during his employment, but Lowe never reported those incidents to HR. *See* Def.'s Facts ¶¶ 41–45.

Lowe did, however, complain about Arfsten repeatedly accusing him of using marijuana. The first incident occurred on March 7, 2022, just a few days into the job. *See* Doyle MIL Decl. Ex. P, at 1, 6–7. Arfsten tried to randomly drug test Lowe and falsely claimed that the Salvation Army tested all new hires. *See id.*; *see also* 3d Am. Compl., at 4. (Lowe had already been drug tested as part of the hiring process. Def.'s Facts ¶ 46.) Kirksey intervened and explained that company policy required reasonable suspicion before drug testing its warehouse workers. A few days later, Arfsten entered the rehabilitation center's sorting room and said it smelled like weed. *See* 3d Am. Compl., at 4; Doyle MIL Decl. Ex. P, at 1–2. Only Lowe and Kozak were present at the time, but no drug test was conducted. On March 17, 2022, Arfsten claimed to smell weed again while in the center's stairwell. *See* 3d Am. Compl., at 5; Doyle MIL Decl. Ex. P, at 2, 7. Lowe and Kozak were there, too, and both

thought that Arfsten had accused Kozak of being the source of the skunky smell. However, Arfsten did not ask Kozak to submit to a drug test. Kozak and Lowe reported the incident to HR.

According to Lowe, Arfsten continued to single him out for allegedly being on drugs. *See* 3d Am. Compl., at 5; Def.'s Facts ¶¶ 53–57; Doyle MIL Decl. Ex. P, at 2, 8. Arfsten accused Lowe of smelling like weed shortly after he arrived for work on March 28, 2022. He ordered a drug test, but Lowe had difficulty passing a sample, so Staneart sent him home. Arfsten had Lowe drug tested when he reported for work the following day. After he passed the test, Lowe asked his co-workers if he had smelled like weed the previous day, and they all said no. Lowe also told HR that he believed Arfsten was unfairly targeting him because he is black. The following day, Kirksey and Grandstaff met with Arfsten and explained that his behavior could be perceived as discriminatory, as Arfsten had accused Lowe, an African American man, of smelling like weed and had him drug tested but didn't drug test Kozak, a Caucasian woman, when he smelled weed on her. *See* Doyle MIL Decl. Ex. P, at 8–9. Kirksey wrote Arfsten up for his behavior; however, Staneart demanded that the write-up be discarded.

Arfsten accused Lowe of smelling like weed again on April 1, 2022. *See* 3d Am. Compl., at 5–6; Def.'s Facts ¶¶ 61–62; Doyle MIL Decl. Ex. P, at 2–3, 9. He pulled Lowe out of the sorting room, smelled his shirt, and asked if he had a change of clothes. Lowe became emotional and walked around the warehouse asking his co-workers if he smelled like weed; again, they all said no. Grandstaff and Kirksey indicated that Lowe smelled like smoke but not weed. (Lowe admitted during his deposition that he vaped and smoked Black and Mild cigars before work and sometimes during his breaks. However, he denied smoking marijuana.

*See* Def.'s Facts ¶¶ 37–39.) Lowe wasn't drug tested, but he was so worked up about the accusation that he left the warehouse around 9:15 a.m.

Throughout his employment, Lowe struggled to make it to work by his 7:30 a.m. start time. He clocked in five minutes late on his second day on the job and nearly forty minutes late the following day. *See* Staneart Decl. Ex. B, at 1, ECF No. 35-2. On March 11, 2022, Lowe told Arfsten that he was going to be about ten minutes late because his bus had stalled. *See* Doyle MIL Decl. Ex. P, at 5. Arfsten warned Lowe that he'd be written up if he was late again. When Lowe showed up for work, he told Arfsten that he had transportation issues, and he asked if his start time could be moved to 8:00 a.m. *See id.* at 1, 7–8; *see also* Def.'s Facts ¶¶ 48, 50–52; Pl.'s Facts ¶¶ 2–3. It appears Arfsten approved that schedule change. However, the following day, Staneart told Lowe that an 8:00 start time wouldn't work because someone needed to be in the sorting room at 7:30 to supervise the beneficiaries.

Lowe complained to HR about Staneart's reversal. Kirksey gave him a copy of the warehouse worker job description, which didn't list supervising beneficiaries as one of the essential functions of the job. *See* Doyle MIL Decl. Ex. P, at 1, 8; *see also* Doyle Summ. J. Decl. Ex. A, at 62–63, ECF No. 36-1. Kirksey also showed the job description to Staneart and explained that it was Kozak's job as the sorting room supervisor to oversee the beneficiaries' work therapy.

Lowe continued to show up after 7:30 a.m. for his shifts throughout March. *See* Staneart Decl. Ex. B, at 1–2. On March 29, 2022—the same day of the third drug test—the Salvation Army issued Lowe a written warning for tardiness. Def.'s Facts ¶ 58. The next day, Lowe again asked for a modified work schedule. *Id.* ¶ 59. Lowe says Arfsten approved him working part time from 8:00 a.m. until 1:00 pm. *See* Doyle MIL Decl. Ex. P, at 2, 8–9. Around

the same time, Lowe requested a meeting with management to discuss his work schedule and the alleged targeting by Arfsten.

On April 4, 2022, Lowe met with Staneart, Grandstaff, Arfsten, and Kirksey. *See* Def.'s Facts ¶¶ 64–71; Pl.'s Facts ¶¶ 4–5. The meeting was recorded. *See* Doyle Summ. J. Decl. Ex. D-1, ECF No. 36-4 (stored electronically in the clerk's office); Doyle Summ. J. Decl. Ex. D-2, ECF No. 36-5 (same); Doyle MIL Decl. Ex. L, ECF No. 31-12; Pl.'s Resp. Mot. in Limine Ex. 1, at 37–79, ECF No. 41-1; Doyle MIL Decl. Ex. P, at 3, 9. During the meeting, Staneart told Lowe not to accuse other team members of being racist, that he couldn't come to work smelling like smoke, and that he needed to be in the sorting room at 7:30 a.m. Lowe asked why the company could accommodate John's part-time schedule but not his request to start a half hour later. Also, Kirksey said that Kozak and Martin were allowed to start at 9:30 when they were warehouse workers. Staneart reiterated that he needed someone in the sorting room from 7:30 a.m. until 4:00 p.m. and that was what he thought the company had hired Lowe for. Staneart also acknowledged that he had previously left the scheduling decision up to Arfsten; however, as the captain in charge of the rehabilitation center, he had authority to overrule Arfsten's decision. And Staneart explained that John was allowed to work a reduced schedule because he was a graduate of the rehabilitation program and because those were the only days and times he was available. Staneart did approve Lowe's other scheduling request to become a part-time employee and leave work at 1:00. Def.'s Facts ¶ 67.

The April 4 meeting was the beginning of the end for Lowe's time with the Salvation Army. On April 8, 2022, Lowe tried calling in sick. *See* Def.'s Facts ¶ 72; Pl.'s Facts ¶ 7; Doyle MIL Decl. Ex. P, at 3, 5, 10; Staneart Decl. Ex. B, at 1–2. Arfsten told Lowe that, because he was a new employee still within his probationary period, it would be unwise to miss any work.

Lowe showed up at 7:41 a.m., threw up, and was sent home. On April 11, 2022, Lowe again requested to adjust his start time to 8:00 a.m. *See* Def.'s Facts ¶¶ 73–74, 76; Pl.'s Facts ¶ 8; Doyle MIL Decl. Ex. P, at 3–4, 10–12. Staneart told Lowe that he needed to work his scheduled hours, meaning Monday through Friday starting at 7:30 a.m. After a heated discussion, Staneart sent Lowe home for the day. Staneart also claims Lowe said he wouldn't work his scheduled hours. *See* Def.'s Facts ¶ 75. Staneart informed Kirksey about the situation and said he intended to suspend Lowe pending termination. *See* Doyle MIL Decl. Ex. P, at 4, 10–12. That same day, Lowe filed an incident report claiming that Staneart had sent him home after he asked for a schedule modification and because he wasn't wearing appropriate footwear. *See* Doyle Summ. J. Decl. Ex. A, at 78. The following day, April 12, 2022, the Salvation Army terminated Lowe's employment, citing insubordination. *See* Doyle MIL Decl. Ex. P, at 4, 10; *see also* Def.'s Facts ¶ 77. Lowe showed up to work anyway, and Staneart refused to provide him a written suspension notice.

On October 7, 2022, Lowe filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission. Def.'s Facts ¶ 79. The EEOC investigated the charge, declined to proceed further, and issued Lowe a right-to-sue letter. *See* Doyle MIL Decl. Ex. J, at 22–25, ECF No. 31-10.

In March 2025, Lowe sued his former employer in federal court. *See* Compl., ECF No. 1. He subsequently filed an amended complaint asserting that the Salvation Army, Arfsten, and Staneart treated him differently because of his race, subjected him to a racially hostile work environment, retaliated against him for reporting discrimination, and wrongfully terminated him in violation of public policy. *See* Am. Compl., ECF No. 4. I dismissed the amended complaint under 28 U.S.C. § 1915 and gave Lowe another chance to amend. *See*

Order, ECF No. 5. In May 2025, Lowe filed a second amended complaint, *see* 2d Am. Compl., ECF No. 6, which I allowed to proceed against the company only, *see* Screening Order & Recommendation, ECF No. 8. Lowe later filed another amended complaint that he characterized as "a continuation of [his] other complaint." 3d Am. Compl., at 2.

On June 15, 2026, the Salvation Army filed a motion for summary judgment. *See* Def.'s Mot. Summ. J., ECF No. 34; Def.'s Br., ECF No. 38. Lowe responded to the motion on August 5, 2026—about sixteen days after it was due. *See* Pl.'s Resp., ECF No. 44; Pl.'s Suppl. Br., ECF No. 45. After I informed the parties that I intended to consider Lowe's late submissions, *see* Text Only Order, ECF No. 50, the Salvation Army filed a supplemental reply brief, *see* Def.'s Suppl. Reply, ECF No. 51. The parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Rule 73(b) of the Federal Rules of Civil Procedure. *See* ECF Nos. 3 & 14.[1]

## SUMMARY JUDGMENT STANDARD

The Salvation Army has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a) "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of

[1] The Salvation Army has also moved to dismiss this action in its entirety based on Lowe's discovery deficiencies. *See* Def.'s Mot. in Limine, ECF No. 29. Dismissal is a draconian sanction, and the company has not shown that any of the alleged shortcomings inhibited its ability to seek summary judgment on liability. *See, e.g.*, *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 775–77 (7th Cir. 2016) (explaining that dismissal as a sanction for discovery-related misconduct should be reserved for extreme situations). In any event, this motion is rendered moot by this decision.

material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018)). In deciding whether there are any material facts in dispute, courts must "construe all facts and make all reasonable inferences in the nonmoving party's favor." *Id.* (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020)).

## DISCUSSION

Lowe appears to assert three claims under Title VII of the Civil Rights Act of 1964: that the Salvation Army (1) discriminated against him based on his race, (2) subjected him to a racially hostile work environment, and (3) retaliated against him for complaining about discrimination. The Salvation Army seeks summary judgment on each claim.

### I. The Salvation Army Is Entitled to Summary Judgment on Lowe's Race Discrimination / Termination Claim

Lowe alleges that the Salvation Army treated him differently because he is black. More specifically, he contends that the company denied his requests for a schedule modification, repeatedly accused him of smelling like marijuana and had him submit to drug tests, and, most importantly, eventually terminated him from his position as a warehouse worker. The Salvation Army insists that the company fired Lowe not because he is black, but because he was frequently late for work and he refused to work his scheduled hours.

Title VII prohibits an employer from discharging or otherwise discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). "In discrimination cases, '[w]hen a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the

discharge or other adverse employment action.'" *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)). Lowe must therefore show that discrimination was "a motivating factor" in the Salvation Army's decision to take adverse action. *See Pratt v. Wis. Aluminum Foundry*, 183 F.4th 541, 561–62 (7th Cir. 2026) (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 337 (2020)).

### A. Lowe Suffered One Adverse Employment Action: Termination

At the outset, we must ask what, if any, adverse employment actions Lowe suffered. An adverse employment action, such as a termination or demotion, must effect "some quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference." *Paterakos v. City of Chicago,* 147 F.4th 787, 796 (7th Cir. 2025)); the employee must show that the action "brought about some 'disadvantageous' change in an employment term or condition" even if that change is not substantial. *Muldrow v. City of St. Louis, Missouri,* 601 U.S. 346, 354 (2024). Obviously, being terminated constitutes an adverse action. But what about the other conduct Lowe complains of? Lowe cites some of Arfsten's commentary and his demands that Lowe get drug testing, but these are not adverse employment actions that materially altered his work conditions. Instead, they are possibly components of a hostile workplace, and so I address these claims further below.[2]

[2] It is conceivable that drug tests could constitute "standalone" adverse employment actions, although in a typical case it is hard to see how a drug test on its own would alter the terms and conditions of employment. This court has not uncovered a single case in which a plaintiff won such a claim. In *Stockett v. Muncie Indiana Transit Sys.,* 221 F.3d 997, 1000 (7th Cir. 2000), the plaintiff (unsuccessfully) brought a solitary claim for discrimination based on a drug test. "Stockett contends that he was required to take the drug test because of his race and that this treatment was an adverse employment action that violated his rights under Title VII." The court treated that as a standalone adverse employment action claim (possibly because that was the only possible way to analyze it), and so it is theoretically possible.

And what about the complaint that Staneart refused to let him change his work schedule? Similarly, that is not an adverse employment action. First, it is not even an "action" at all, because Staneart was simply preserving the *status quo*—a work schedule that Lowe had suggested himself when he started. Taking *no* action cannot logically constitute an adverse employment action. *See, e.g.*, *Campbell v. Hawaii Dep't of Educ.,* 892 F.3d 1005, 1014 (9th Cir. 2018) ("This decision to retain the *status quo* is quite obviously not an adverse employment action."); *Harris v. Proviso Area for Exceptional Children,* 581 F. Supp. 2d 942, 959 n.5 (N.D. Ill. 2008) (failing to give employee additional support staff not adverse action); *Barnett v. Combined Ins. Co. of Am.,* No. 12-CV-1279-MJR-SCW, 2014 U.S. Dist. LEXIS 199509, 2014 WL 11776966, at *6 (S.D. Ill. Apr. 8, 2014) (company's refusal to provide new office and fax machine not an adverse action because it did not change *status quo*); *Palasti v. Fed. Express Corp.,* No. 02 C 1888, 2003 U.S. Dist. LEXIS 7265, 2003 WL 21003693, at *5 (N.D. Ill. May 1, 2003) (company's failure to offer a transfer not an adverse action because it simply maintained the *status quo*). And even if it were an action, decisions regarding shifts and schedules are generally not actionable. *Peters v. Wal-Mart Stores E.,* LP, 512 F. App'x 622, 626 (7th Cir. 2013)("Wal–Mart's refusal to allow Peters to change shifts is not unlawful because schedule assignments generally are not adverse employment actions.") Finally, the requirement to punch in for work at a normal hour like 7:30 a.m. (as compared with 8:00, as Lowe proposed) is hardly the kind of "adverse"

---

In any event, when an employee challenges several aspects of his working conditions and alleges a hostile work environment claim, it seems more appropriate and holistic to analyze whether the complained-of drug tests comprised part of that alleged hostile work environment more generally, as opposed to looking at a drug test in a vacuum. Since *Stockett,* some courts have essentially folded the analysis into the question of whether the complained-of drug tests were severe or pervasive, an analysis that dovetails with the hostile work environment analysis. *E.g., Kelly v. N. Am. Cent./Wisconsin Cent.*, No. 17-CV-1357-BHL, 2022 WL 541508, at *5 (E.D. Wis. Feb. 23, 2022); *Berry v. Arcelormittal USA LLC,* No. 2:10 CV 124, 2013 WL 1499154, at *4 (N.D. Ind. Apr. 10, 2013).

employment action prohibited by the law. Unlike the dreaded graveyard shift, there is nothing inherently "adverse" about punching in at 7:30, as evidenced by the fact that it was Lowe's idea in the first place, and the fact that many of the company's beneficiaries showed up at 7:30 as well. Lowe's desire to begin work a half-hour later is merely a "subjective preference." *Paterakos*, 147 F.4th at 796. I will turn my focus, then, to the termination, the only adverse employment action at issue here.

The Salvation Army organizes its arguments using the traditional burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See* Def.'s Br., at 9–12. Lowe, however, emphasizes the more modern, holistic approach recognized in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). *See* Pl.'s Resp., at 3. "Under the 'holistic' approach . . . "[courts] 'look at the evidence in the aggregate to determine whether it allows an inference of prohibited discrimination.'" *Arnold v. United Airlines, Inc.*, 142 F.4th 460, 469 (7th Cir. 2025) (quoting *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023)).

"Here, as in many Title VII cases, the 'sole question that matters' is causation: 'whether a statutorily proscribed factor caused' a discharge." *Pratt*, 183 F.4th at 551 (quoting *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020)). "To assess causation in employment discrimination cases, [courts] 'ask whether the totality of the evidence shows discrimination, eschewing any framework or formula.'" *Id.* (quoting *Igasaki*, 988 F.3d at 958). "Whether a plaintiff offers direct or circumstantial evidence of discrimination, [the Seventh Circuit] made clear in *Ortiz* . . . that 'all evidence belongs in a single pile and must be evaluated as a whole.'" *Igasaki*, 988 F.3d at 957 (quoting *Ortiz*, 834 F.3d at 766). "Broadly, three types of circumstantial evidence can support an inference of intentional discrimination: '[1] ambiguous or suggestive comments or conduct; [2] better treatment of people similarly situated but for the protected

characteristic; and [3] dishonest employer justifications for disparate treatment.'" *Pratt*, 183 F.4th at 552 (quoting *Joll*, 953 F.3d at 929).

The primary question, then, is whether Lowe has provided enough evidence such that a reasonable jury, considering that evidence, could conclude the Salvation Army terminated him because he was black. Here, no one really disputes that Lowe's nineteen tardy appearances, particularly coming in his first two months on the job, constitute ostensibly legitimate grounds for his termination. In a typical case, the plaintiff would challenge this conclusion by citing evidence that other employees had similar work infractions (tardiness) but were *not* terminated. In *Ortiz,* for example, the plaintiff's employer fired him for falsifying work records, a seemingly unimpeachable motive. However, the court noted that the plaintiff's supervisors had made countless ethnic slurs about the plaintiff, including calling him a "dumb Mexican," and second, the plaintiff had produced evidence that other employees had *not* been fired for the same thing the plaintiff had done. Thus, the court found a jury could disbelieve the company's stated reason for the termination. *Ortiz,* 834 F.3d at 766.

Both of those factors are absent here. First, there is no evidence that anyone—much less Staneart—had made any kind of ethnic remarks about the plaintiff (or anyone else, for that matter). Second, there is no evidence that any other employees had significant problems with tardiness but were allowed to remain employed. This case is thus like *Reed v. Freedom Mortg. Corp.,* 869 F.3d 543, 549 (7th Cir. 2017), where the plaintiff had received "oral and written warnings for violating the Attendance Policy, and . . . continued to be absent and late on multiple occasions after his employer reiterated both the policy and the consequences for violating it." The court noted that "[t]he question is whether he produced any evidence that similarly situated non-African-American employees were treated more favorably." He did not:

"the record contains no evidence regarding the attendance of similarly situated white employees. On this record, only Reed had so many documented violations of the Attendance Policy, and only Reed continued to violate the Policy after being warned of the consequences of his failure to comply." *Id.* at 550. Therefore, the court found that because the plaintiff "cannot demonstrate that Freedom Mortgage treated similarly situated employees more favorably, . . . his claim fail[ed] as a matter of law." *Id.*

There is no discernable reason to reach a different result here. Lowe has not provided any evidence that the company's stated reason for firing him, which is more than reasonable on its face, was not the true reason. In fact, if there were some impermissible motive lurking behind the decision, presumably the employer would have fired Lowe long before he racked up 19 tardy appearances.

### B. Staneart's Scheduling Decision Does Not Show Pretext for the Termination

Lowe spends a great deal of effort attempting to question Staneart's reason for denying Lowe's request to begin work at 8:00, rather than 7:30. Above, I have explained that Staneart's decision was not itself an adverse employment action. However, it appears Lowe wants to use questions about Staneart's decision about Lowe's schedule to cast doubt on the legitimacy of his later reason for Lowe's termination. In other words, Lowe says that because the employer's decision about an *earlier* employment decision was pretextual, that should call into question the company's later decision to terminate his employment. To the extent such an argument is even viable, I conclude that Lowe's effort fails because he cannot show that Staneart's decision was pretextual, nor that the decision caused his ultimate termination.

To recall the facts: after orientation, Arfsten asked Lowe what schedule worked best for him, and Lowe chose to work Monday through Friday from 7:30 a.m. until 4:30 p.m. *See*

*id.* ¶¶ 14–16; Doyle MIL Decl. Ex. P, at 1, 7. It's undisputed that Lowe clocked in *after* 7:30 for 19 of the 28 shifts he worked. *See* Staneart Decl. Ex. B. For most of the tardy shifts, Lowe showed up within 10 or 15 minutes of 7:30. As recounted earlier, Lowe repeatedly requested to modify his schedule due to transportation issues and asked if he could start at 8:00 a.m. instead of 7:30 a.m.[3] *See, e.g.*, Def.'s Facts ¶¶ 50–52, 59–60, 64–68; Pl.'s Facts ¶¶ 2–5, 7–8. Staneart told Lowe that he needed to be in the sorting room at 7:30 to supervise the beneficiaries who arrived at that time. *See* Def.'s Facts ¶¶ 19, 28, 35–36, 52, 64, 67, 74.

Lowe finds this suspicious. First, it appears undisputed that Arfsten—the warehouse manager—approved the change to 8:00 when Lowe first requested it on March 11, 2022. *See* Doyle MIL Decl. Ex. P, at 1, 7–8; *see also* Def.'s Facts ¶¶ 48, 50–52; Pl.'s Facts ¶¶ 2–3; Doyle Summ. J. Decl. Ex. D-1, at 09:08–10:40; Doyle MIL Decl. Ex. L, at 14–16. Staneart pulled rank the following day, and no one disputes his authority as the captain of the rehabilitation center to overrule Arfsten. Arfsten also apparently indicated again on March 30 that Lowe could work a part-time schedule starting at 8:00 a.m. *See* Doyle MIL Decl. Ex. P, at 2, 8–9; Doyle Summ. J. Decl. Ex. D-1, at 04:40–05:45; Doyle MIL Decl. Ex. L, at 6–7. The fact that the warehouse manager would have allowed Lowe to arrive at 8:00 arguably calls into question Staneart's claim that there was a business need for Lowe to be there at 7:30.

Lowe has also presented evidence that, to the extent *someone* needed to be in the sorting room with beneficiaries at the start of their shift, it was not *his* responsibility. The company's job description for its warehouse workers did not list supervising beneficiaries as one of the essential functions of the job. *See* Doyle Summ. J. Decl. Ex. A, at 62–63; *see also* Doyle MIL Decl. Ex. P, at 1, 8. The only thing the description says about beneficiaries is that warehouse

[3] Only twice did Lowe clock in after 8:00 a.m.—once at 8:07, and another time at 8:01. *See* Staneart Decl. Ex. B.

workers assist or support them in work therapy development. Kirkey (the company's HR representative) showed the job description to Staneart, who complained "that it was unrealistic." Doyle MIL Decl. Ex. P, at 8. Kirksey also noted that the job description for a sorting room supervisor did list overseeing work therapy as an essential function. *See id.* at 1, 8. Thus, according to Kirksey, it was Kozak's job—not Lowe's—to supervise the beneficiaries. The Salvation Army also acknowledges that Lowe was not always alone with the beneficiaries at the start of his shift. *See* Def.'s Facts ¶ 34. In sum, a jury might conclude that the Salvation Army could have accommodated Lowe's request to start a half-hour later.

Lowe also argues that Staneart's decision is suspect because the company allowed other employees to work later schedules. It is undisputed that the company allowed John—a white warehouse worker who was hired around the same time as Lowe—to work only two days a week, starting at 9:30 a.m. each day. *See* Pl.'s Facts ¶¶ 1, 4; Def.'s Facts ¶¶ 17–22. Lowe has also presented evidence suggesting that the company permitted Kozak and Martin (both white) to arrive at 9:30 a.m. *See* Pl.'s Facts ¶¶ 4–5; Doyle MIL Decl. Ex. P, at 3, 8–9; Doyle Summ. J. Decl. Ex. D-1, at 07:01–08:50; Doyle MIL Decl. Ex. L, at 10–14; Doyle MIL Decl. Ex. H, at 3. The Salvation Army insists that those individuals are not valid comparators.

"The similarly-situated analysis calls for a 'flexible, common-sense' examination of all relevant factors." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)). "Similarly situated employees 'must be directly comparable to the plaintiff in all material respects,' but they need not be identical in every conceivable way." *Id.* (quoting *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)). "So long as the distinctions between the plaintiff and the proposed comparators are not 'so significant that they render the comparison effectively useless,' the similarly-situated

requirement is satisfied." *Id.* (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)).

It's true that John held the same position as Lowe, worked the same shift during the same timeframe, and dealt with the same supervisor(s). However, it appears that John, who had a disability, was hired with a later schedule in mind right from the outset. He was not granted the kind of schedule change Lowe now insists he should have been granted himself. John was also known to the Salvation Army, having earlier been a beneficiary himself, whereas Lowe was a brand-new employee. John also had a disability and had signed up to work a part-time position, unlike Lowe. They are thus not similar enough to warrant some kind of adverse inference from their disparate treatment.

Lowe also says Kozak and Martin were allowed to work later schedules. Lowe provides little information about their work schedules and whether they were granted changes to their original schedule. Nor do we know who the decisionmaker was. Thus, no one could reasonably make some sort of adverse inference simply because other employees had schedules that Lowe himself would have preferred. Nor do we know the timing: Lowe forgets that he was demanding a new schedule within his very first weeks on the job, something he does not allege Kozak and Martin asked for or received. All he says is that they worked a later schedule. And Staneart says he never approved a schedule change for anyone that resulted in the beneficiaries being unsupervised. *See* Staneart Decl. ¶ 45, ECF No. 35. The comparators Lowe proposes thus do not shed much light on whether Staneart's decision was pretextual.

Taking the evidence in the light most favorable to Lowe, a jury could reasonably find that Staneart's decision to strictly enforce the 7:30 start time was not crucial to the Salvation Army's operations. However, that does not mean a jury gets to sit in judgment of the wisdom

of this particular business decision. The pretext analysis is not an invitation to conduct a wide-ranging consultant-style analysis of the employer's stated reason for a business decision. The court of appeals has repeated more than one-hundred times that courts are not a "super-personnel department" designed to second-guess day-to-day employment decisions. *Joll*, 953 F.3d at 933.

The question is thus not whether the decision was valid from a business perspective, but whether the decision was honestly made. *See Davis v. Con-Way Transp. Cent., Inc.,* 368 F.3d 776, 784 (7th Cir. 2004) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well considered." (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000))) Here, Staneart provided a business reason for his decision—the desire to have someone supervising beneficiaries at 7:30. Moreover, Lowe overlooks that Staneart *did* approve Lowe's other request to change his schedule by letting him leave at 1:00. *See* Staneart Decl. ¶ 37. This, of course, was a much more radical change: it meant Lowe would now become a part-time worker working close to half the hours originally planned. The change Staneart denied was small potatoes by contrast—merely a half hour in the mornings. By making this distinction—approving one request but not the other—Staneart's actions strongly suggest he had a business-based rationale for requiring Lowe to work at 7:30 while allowing him to leave at 1:00. And, of course, one would expect that if Staneart didn't like Lowe, or harbored some kind of racial animus, he would have stonewalled on *both* requests. Ultimately, it is Lowe's burden to demonstrate that Staneart's reason was not just wrong but dishonest, but here he cannot. *See Wilson v. AIM Specialty Health,* 176 F.4th 977, 986 (7th Cir. 2026) ("[S]incerity is the heart of the pretext inquiry.") There is simply no evidence that Staneart harbored some kind of racial animus.

It's possible that Lowe sees this as a "set up to fail" kind of case. In such cases, the company sets the employee up to fail by creating impossible standards or sabotaging his work performance, thus giving rise to ostensibly plausible grounds for a termination at a later date. For example, in *Herrnreiter v. Chicago Housing Authority,* the plaintiff argued that he was "set up" to fail "by being given tasks that he could not be expected to complete within the prescribed deadlines and then being fired when he failed to make them." 315 F.3d 742, 746 (7th Cir. 2002); *see also Sargis v. Amoco Corp.,* 996 F. Supp. 790, 794 (N.D. Ill. 1998) (rejecting plaintiff's set-up-to-fail argument because the employer's expectations were "objectively reasonable and adequately communicated" to the plaintiff); *Williams v. Aetna Bearing Co.,* No. 96 C 6593, 1998 U.S. Dist. LEXIS 6114, 1998 WL 214701, at *8 (N.D. Ill. Apr. 23, 1998) (rejecting plaintiff's set-up-to-fail argument because the tasks required were not "so unrealistic or unreasonable so as to infer that [the company] did not honestly want them completed"). The common thread in all these cases is the employee's allegation that the expectations set by the employer were so extreme that they essentially *caused* the employee to fail and thus to be terminated. Therefore, the court can look to the expectations imposed earlier even though they predated the decision to terminate.

This is not one of those cases. The Salvation Army's requirement that Lowe appear for work at 7:30 was hardly the kind of unattainable goal that set Lowe up to fail. First, I repeat that the 7:30 start time was Lowe's own idea in the first place, suggesting that the start time was hardly unreasonable. Second, there is nothing particularly unusual or unattainable about 7:30 as a start time for a job, as established by the fact that Lowe himself often appeared on time or within ten minutes of 7:30. *See Sargis,* 996 F. Supp at 794 ("[T]he 9:30 a.m. deadline was the main job requirement [of the plaintiff's position]. . . . [Plaintiff] met this goal during

part of her June probationary period, indicating the goal was attainable.”). Finally, even now, after extensive discovery and briefing, it is something of a mystery why Lowe was late so often. In one instance there is a record of a bus breaking down and causing a short delay, but otherwise Lowe does not explain why the relatively common start time of 7:30 was so unrealistic that Staneart could have thought he was effectively setting Lowe up to fail. That Lowe had experienced some difficulty being on time did not guarantee he could not fix the problem. The earlier start time thus did not cause Lowe’s tardiness and eventual termination.

In sum, any factual disputes about the business wisdom of the 7:30 start time are largely immaterial because (1) there’s no evidence that Staneart was lying when he explained why he wanted Lowe to show up at 7:30, and (2) that work schedule was not so unattainable that it set Lowe up for failure. The Salvation Army is therefore entitled to summary judgment on Lowe’s discrimination/termination claim.

## II. The Salvation Army Is Entitled to Summary Judgment on Lowe’s Hostile Work Environment Claim

Title VII prohibits employers from maintaining a racially hostile work environment. *See Scaife v. U.S. Dep’t of Veteran Affairs*, 49 F.4th 1109, 1115 (7th Cir. 2022). “A work environment is hostile under Title VII ‘[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.’” *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To succeed on a racially hostile work environment claim, an employee must show that “(1) he was subject to unwelcome harassment; (2) the harassment was based on race . . . (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or

abusive work environment; and (4) there is a basis for employer liability." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018) (citations omitted).

In determining whether conduct is severe or pervasive, courts must consider the totality of the circumstances. *See Scaife*, 49 F.4th at 1116 (citing *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013)). Relevant factors include "the severity of the alleged conduct, its frequency, whether it is physically threatening or humiliating (or merely offensive), and whether it unreasonably interferes with the employee's work performance." *Robinson*, 894 F.3d at 828 (citing *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900–01 (7th Cir. 2018); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)). "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Johnson*, 892 F.3d at 901 (citing *Passananti v. Cook County*, 689 F.3d 655, 669 (7th Cir. 2012)). "In order to remove such a question of fact from the jury on summary judgment, the court would have to determine that no reasonable jury could find the conduct at issue severe or pervasive." *Id.*

Lowe alleged in his complaint that, on his first day on the job, Arfsten told him that he looked like his favorite rapper from back in the day. *See* 3d Am. Compl., at 4. According to Lowe, Arfsten made similar comments a few other times. *See* Def.'s Facts ¶ 44. Lowe did not mention those comments in either of his summary judgment briefs. *See* Pl.'s Resp., at 1–4; Pl.'s Suppl. Br., at 1–6. Thus, it appears he has abandoned this theory of liability.

Even if not abandoned, Arfsten's stray remarks are not sufficiently severe or pervasive as to have altered the terms or conditions of Lowe's employment. Lowe does not allege that the comments were made near or in connection with any employment action. *See Johnson*, 892 F.3d at 900 ("Offhand comments, isolated incidents, and simple teasing do not rise to the

level of conduct that alters the terms and conditions of employment." (quoting *Passananti*, 689 F.3d at 667)). Indeed, he admits that he never reported Arfsten's comments to anyone at the company. *See* Def.'s Facts ¶ 45. Lowe also indicated during his deposition that, while he couldn't recall the name of the rapper, he perceived Arfsten's comments as an insult because he doesn't look like anyone but himself and because the rapper Arfsten compared him to talked only about drugs and money and nothing positive. *See id.* ¶¶ 42–43. The severe-or-pervasive test, however, also includes an objective component. *See Scaife*, 49 F.4th at 1115–16. And, considering the innocuous nature and infrequency of the remarks, I find that no reasonable jury could find that Arfsten's comments created an objectively hostile work environment.

More seriously, Lowe also asserts that Arfsten repeatedly accused him of smelling like marijuana and subjected him to multiple drug tests. The Seventh Circuit has held that requiring an employee to submit to a drug test as a condition of his employment is an adverse employment action actionable under Title VII if the test "is not performed in a routine fashion following the regular and legitimate practices of the employer, but is conducted in a manner that harasses or humiliates employees." *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001–02 (7th Cir. 2000) (citing *Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624–25 (8th Cir. 1995)). Here, Lowe has produced some evidence demonstrating that the Salvation Army applied its drug-testing policy in a discriminatory manner. Although there's evidence in the record suggesting that Lowe may have smelled like smoke at work, *see* Def.'s Facts ¶¶ 37–39, there's also evidence that the company did not drug test Kozak when Arfsten smelled weed on her, *see* Doyle MIL Decl. Ex. P, at 2, 7; Doyle Summ. J. Decl. Ex. D-2, at 02:36–03:39; Pl.'s MIL Resp. Ex. 1, at 53–56.

Even so, the facts do not suggest the environment rose to the level of a hostile work environment (nor do they constitute a standalone adverse action). Lowe was subjected to three drug tests in a short timeframe. The first was the test that all employees are subject to, so that does not give rise to a hostile work environment on its own. Then, a few weeks after Lowe started work, Arfsten said he smelled marijuana and ordered Lowe to undergo a drug test. Lowe proved unable to provide a urine sample that day, so Arfsten ordered him to take a test the next day. Lowe passed the test. Arfsten also accused Lowe of smelling like marijuana on another occasion, which caused Lowe to become irate and leave work. In sum, although Arfsten ordered two additional drug tests, the second one followed from the fact that Lowe could not provide a sample the previous day.

Courts must consider the totality of the circumstances, not just the facts that offended the plaintiff. *Scaife*, 49 F.4th at 1116. Under the totality of the circumstances, the accusations about smelling like marijuana and the requirement to take one or two more drug tests were hardly serious or pervasive enough to alter the basic terms of Lowe's employment. First, Lowe admits that he smoked cigars and therefore smelled like some kind of smoke that was likely different in odor from cigarette smoke. There is thus some basis for Arfsten requiring drug testing, particularly for a brand-new employee. Second, recall that Arfsten was the very same supervisor approved Lowe's request to change his work schedule. The fact that Arfsten required a few additional drug tests must be balanced against his otherwise favorable treatment of Lowe.

Finally, the additional drug tests simply do not create a hostile work environment. In *Jackson v. Wood Grp. USA, Inc.,* for example, the plaintiff alleged he was subjected to three random drug tests within a 90-day period, despite white workers not being selected. No. CV

H-20-0409, 2021 WL 3832936, at *16 (S.D. Tex. Apr. 1, 2021), aff'd, No. 21-20210, 2022 WL 1101738 (5th Cir. Apr. 13, 2022). He further alleged that his bosses had used the "n-word," including a reference to the plaintiff himself. *Id.* Even so, the court found that "Jackson's testimony shows that the instances of unwelcome drug testing about which he complains were merely isolated incidents that were not sufficiently frequent, severe, threatening, or humiliating to have interfered with or undermined his work performance." *Id.*

The same result holds here. Unlike *Jackson,* Lowe's supervisor engaged in no overtly racist behavior and actually tried to help Lowe change his schedule, which is the central focus of this entire action. Under those circumstances, even if Arfsten's apparent bugaboo about marijuana odors was annoying or misguided, his comments and the additional drug tests did not constitute a hostile work environment. Had they persisted for months, perhaps it would be a different story. Accordingly, the Salvation Army is entitled to summary judgment on Lowe's hostile work environment claim.

## III. The Salvation Army Is Entitled to Summary Judgment on Lowe's Retaliation Claim

Title VII also "prohibits employers from 'retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice.'" *Pratt*, 183 F.4th at 556 (quoting *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018)); *see also* 42 U.S.C. § 2000e-3(a). "[The] analysis focuses on one fundamental question: 'could a reasonable trier of fact infer retaliation . . . ?'" *Id.* (quoting *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015)). To survive summary judgment on his retaliation claim, Lowe "must offer evidence that would permit a reasonable juror to find that: (1) [he] engaged in protected activity; (2) [he] suffered an adverse employment action; and (3) a causal connection exists between the protected

activity and that adverse employment action." *Id.* (citing *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023)).

It's undisputed that Lowe's termination constitutes an adverse employment action. However, the parties dispute whether Lowe engaged in statutorily protected activity, and if so, whether there's a causal connection between that activity and Lowe's termination. For his claim to survive, Lowe "must show that [he] sincerely and reasonably believed that [he] was reporting conduct prohibited by Title VII." *Pratt*, 183 F.4th at 556–57 (citing *Castro*, 786 F.3d at 564).

Lowe has provided evidence in the record showing that he complained about racial discrimination prior to his termination. Lowe apparently told HR on March 29, 2022—the day of the third drug test—that Arfsten was unfairly targeting him, *see* Doyle MIL Decl. Ex. P, at 2, 8–9, and it's clear that Lowe attributed the mistreatment to his race. The following day, Kirksey and Grandstaff met with Arfsten and explained that his behavior could be perceived as discriminatory, as Arfsten had accused Lowe, a Black man, of smelling like weed and had him drug tested but didn't drug test Kozak, a white woman, when he smelled marijuana on her. Kirksey attempted to discipline Arfsten for his behavior, but Staneart rescinded the write-up.

Around that same time, Lowe requested a meeting with management to discuss his work schedule and the alleged targeting by Arfsten. *See* Def.'s Facts ¶ 60 ("Plaintiff requested a meeting with Staneart to discuss that he felt 'prejudiced' by Arfsten because others had their schedules accommodated."). Staneart began the meeting by admonishing Lowe for calling Arfsten racist. *See* Doyle Summ. J. Decl. Ex. D-1, at 00:28–00:48; Doyle MIL Decl. Ex. L, at 1. Later in the meeting, Lowe indicated it was unfair that someone "the opposite color" of

him (i.e., John) could be accommodated with a part-time schedule but he wasn't allowed to start his shifts a half hour later. *See* Doyle Summ. J. Decl. Ex. D-1, at 06:13–06:57; Doyle MIL Decl. Ex. L, at 9. Arfsten also expressed remorse that Lowe felt like he had been attacked and insisted he was not a racist. *See* Doyle Summ. J. Decl. Ex. D-2, at 04:10–07:25; Pl.'s MIL Resp. Ex. 1, at 56–62. And when Staneart informed HR of his decision to suspend Lowe, he acknowledged that Lowe had accused Arfsten of racism. *See* Doyle MIL Decl. Ex. P, at 11. Together, this evidence shows that Lowe sincerely and reasonably believed he was opposing unlawful behavior. *See Pratt*, 183 F.4th at 557 ("When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009))).

That leaves causation. "The 'key question' on causation is 'whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action.'" *Pratt*, 183 F.4th at 559 (quoting *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019)). To establish this causal link, "a plaintiff may offer evidence of 'suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.'" *Id.* (quoting *Boumehdi*, 489 F.3d at 792). "[I]n retaliation cases, a plaintiff must show but-for causation." *Adebiyi v. S. Suburban Coll.,* 98 F.4th 886, 892 (7th Cir. 2024).

Lowe has not presented sufficient evidence from which a reasonable jury could infer he would not have been fired but-for his protected activity. First, timing is rarely enough to warrant a jury trial. In some cases, such as where a long-time employee with a good record is

suddenly treated adversely after making a complaint, a jury might infer that the timing is inherently suspicious. *See, e.g.*, *Moore v. Advanced Tech. Servs., Inc.,* No. 22-CV-1075, 2022 U.S. Dist. LEXIS 241217, 2022 WL 19403698, at *10 (C.D. Ill. Aug. 16, 2022) (plaintiff "was a good employee with no history of discipline" and was fired soon after engaging in protected activity). This is not one of those cases. Although Lowe was fired about a week after his meeting with management, under the circumstances that is hardly suspicious. Lowe had been on the job only six weeks and yet had racked up more than a dozen tardy appearances by then; he was hardly a model employee. Timing cannot be considered "suspicious" when the employee's work infractions happen to coincide with the employee's complaints. Moreover, as discussed earlier, Lowe has failed to demonstrate that the company's reason for terminating his employment was pretextual. There is simply nothing suspicious about an employer firing a new employee who is late more often than he's on time. The Salvation Army would have fired Lowe regardless of any earlier complaints he made.

The case of *Gracia v. SigmaTron International, Inc.,* 842 F.3d 1010 (7th Cir. 2016) proves a helpful contrast. There, the employee filed an EEOC complaint, and the company fired her two weeks later. The court found that the plaintiff had shown not only suspicious timing, but pretext and disparate treatment as well:

> In this instance, only two weeks after SigmaTron received Gracia's EEOC charge, the company terminated her, claiming falsely that she had engaged in misconduct. Additionally, . . . others had engaged in similar conduct . . . or worse . . . and had not been fired. Gracia thus presented all three kinds of circumstantial evidence of retaliatory motive mentioned in the case law: suspicious timing, a pretextual explanation for the termination, and evidence that similarly situated employees were treated differently.

*Id.* at 1021 (citing *Castro*, 786 F.3d at 565). Here, by contrast, Lowe has gone 0-for-3. The timing of the discharge wasn't suspicious under the circumstances; the employer's explanation

for the discharge is convincing; and Lowe has identified no one else who was retained by the company despite similar conduct. Accordingly, the Salvation Army is entitled to summary judgment on Lowe's retaliation claim.

## CONCLUSION

Lowe has not presented sufficient evidence from which a reasonable jury could find that the Salvation Army terminated him because of his race, subjected him to a racially hostile work environment, or retaliated against him for complaining about racial discrimination. Accordingly, for all the foregoing reasons, the court **GRANTS** the defendant's motion for summary judgment, ECF No. 34. Judgment will be entered accordingly.

**SO ORDERED** this 18th day of November, 2026.

STEPHEN C. DRIES
United States Magistrate Judge